OPINION
On May 24, 1996, Phillip E. Donner was removed from his position as an Attorney 6 with the Ohio Bureau of Workers' Compensation ("BWC"). Mr. Donner's removal was pursuant to an R.C. 124.34 order which provided Mr. Donner was being removed "[a]s an unclassified employee." Mr. Donner had been employed at the BWC since 1977. He began as a staff attorney and subsequently attained the position of assistant director of the BWC legal department. In 1982, Mr. Donner was promoted to law director, and he was responsible for the operation of the BWC legal department and its staff of approximately fifty employees.
In 1994, the Ohio Supreme Court decided the case ofState ex rel. Crabtree v. Ohio Bur. of Workers' Comp. (1994),71 Ohio St.3d 504 ("Crabtree"). Crabtree involved the issue of the BWC's ability to terminate temporary total disability compensation following a medical conclusion that an injured worker has reached maximum medical improvement. The impact of that decision affected the jurisdiction of the BWC because the Supreme Court held that the BWC was not an adjudicatory agency (i.e., the BWC could not terminate temporary total disability in disputed cases); hence, all disputed claims should be forwarded to the Industrial Commission of Ohio ("Industrial Commission").
In February 1995, John Annarino left his position as executive secretary of the Industrial Commission and assumed the duties of chief legal counsel for the BWC. On March 3, 1995, Mr. Annarino reassigned Mr. Donner from his position as law director to a position coordinating the BWC's efforts to implementCrabtree. On March 5, 1995, Mike Travis, who had been director of hearing services for the Industrial Commission, moved to the BWC. Mr. Travis was assigned to perform Mr. Donner's prior duties as law director under the new title of "director of legal operations." In reassigning Mr. Donner, Mr. Annarino limited Mr. Donner's duties to those concerning the implementation ofCrabtree, and Mr. Donner no longer supervised any BWC personnel.
On April 3, 1996, Mr. Donner was informed that his position was being formally placed in the unclassified service, effective April 14, 1996. On May 24, 1996, appellant was removed from his employment with the BWC.
Mr. Donner appealed his removal to the State Personnel Board of Review ("board"). An administrative law judge ("ALJ") conducted a hearing beginning October 21, 1996. On May 20, 1997, the ALJ submitted a report and recommendation. The ALJ found that pursuant to R.C. 124.11(A)(9), Mr. Donner was authorized to act for and on behalf of the BWC and, therefore, was an unclassified employee. Accordingly, the ALJ recommended that the board dismiss Mr. Donner's appeal for lack of subject-matter jurisdiction.
On June 17, 1997, the board adopted the ALJ's report and recommendation. Mr. Donner appealed to the Franklin County Court of Common Pleas. On October 27, 1998, the common pleas court rendered its decision, affirming the board order. An entry was journalized on November 4, 1998. Mr. Donner (hereinafter "appellant") has appealed to this court, assigning the following errors for our consideration:
FIRST ASSIGNMENT OF ERROR
 THE COURT BELOW ERRED IN HOLDING THAT APPELLANT'S POSITION WAS IN THE UNCLASSIFIED SERVICE PURSUANT TO SECTION 7 OF HOUSE BILL 7, EFFECTIVE SEPTEMBER 1, 1995.
SECOND ASSIGNMENT OF ERROR
 THE COURT BELOW ERRED IN HOLDING THAT THE DECISION OF THE STATE PERSONNEL BOARD OF REVIEW WAS IN ACCORDANCE WITH LAW.
We address appellant's second assignment of error first. Appellant contends the trial court erred as a matter of law in affirming the board's order which adopted the ALJ's conclusion that appellant was in the unclassified service. Appeals from orders of the board are governed by R.C. 119.12, which states in pertinent part:
 The court may affirm the order of the agency complained of in the appeal if it finds, upon consideration of the entire record and such additional evidence as the court has admitted, that the order is supported by reliable, probative, and substantial evidence and is in accordance with law. In the absence of such a finding, it may reverse, vacate, or modify the order or make such other ruling as is supported by reliable, probative, and substantial evidence and is in accordance with law. * * *
 The judgment of the court shall be final and conclusive unless reversed, vacated, or modified on appeal. * * *
In reviewing the board's order, the common pleas court must give due deference to the administrative resolution of evidentiary conflicts when, for example, conflicting testimony is of approximately equal weight. Univ. of Cincinnati v. Conrad
(1980), 63 Ohio St.2d 108, 111. However, the findings of the administrative agency are by no means conclusive. Id. While it is incumbent upon the common pleas court to examine the evidence, this is not the function of the court of appeals. Pons v. OhioState Med. Bd. (1993), 66 Ohio St.3d 619, 621. This court is to determine only if the common pleas court abused its discretion — an abuse of discretion being not merely an error of judgment, but perversity of will, passion, prejudice, partiality, or moral delinquency. Id. However, as to whether or not the board's order is in accordance with law, our review is plenary. Gen. MotorsCorp. v. Joe O'Brien Chevrolet, Inc. (1997), 118 Ohio App.3d 470,483, discretionary appeals not allowed in (1997), 79 Ohio St.3d 1445.
Appellant initially contends that he is a classified employee pursuant to R.C. 4121.121(B)(2). Appellant argues that while much of the focus before the board was whether or not he was exempt from the classified service pursuant to R.C. 124.11(A)(9), the instant case actually rests on R.C. 4121.121(B)(2), which relates to employees of the BWC. Specifically, appellant points to language in R.C. 4121.121(B)(2) which provides that "[a]ll positions of employment in the bureau are in the classified civil service except those employees the administrator may appoint to serve at the administrator's pleasure in the unclassified civil service pursuant to section 124.11 of the Revised Code."
Appellant contends that prior to April 4, 1996, he had always been listed in the classified civil service throughout his entire employment at the BWC. Appellant further maintains that the action taken by the BWC on April 4, 1996 informing him that his position was being formally placed in the unclassified service did not constitute an appointment because the "personnel action form" contained no check marks under the designation labeled "Appointment." Appellant argues that while his status may have been changed, he was never "appointed" to an unclassified position. In support of such argument, appellant cites to the fact that at the time he was reassigned in March 1995, he retained the same position control number.
Appellant's argument that he was never "appointed" to the unclassified service fails to give recognition to the duties he performed at the BWC while serving as its law director, a position he accepted in 1982. It is undisputed that prior to his reassignment in March 1995, appellant acted in a fiduciary capacity in his role as law director. We note that appellant did not contend at the hearing below that his duties as law director were those of a classified employee. Rather, he contended that the reassignment in 1995 was a demotion under which he performed duties analogous to those of an Attorney 2 or Attorney 3. Further, although appellant contends he has always been in the classified service, his counsel acknowledged at the hearing below that when appellant was still law director, he was "admittedly and clearly in the unclassified service." (Tr. 514-515.)
As to appellant's contention that he retained the same position control number after his reassignment, this court has previously noted that factors such as position number, title and department description play no role in an analysis of an employee's job duties; rather, the actual duties assigned to and performed by the employee are dispositive of the classification.Freeman v. Ohio Department of Human Services (Dec. 14, 1995), Franklin App. No. 95APE03-359, unreported (1995 Opinions 5382, 5392), citing Desmond v. Ohio DOT (July 9, 1984), Darke App. No. 1101, unreported. See, also, Suso v. Ohio Dept. of Dev. (1993),93 Ohio App.3d 493, 501 (the fact that a state employee is carried on the payroll as being in the unclassified service does not establish that classification); Yarosh v. Becane (1980), 63 Ohio St.2d 5.
We agree with the BWC's contention that at the time appellant accepted the position of law director, he was appointed to a position under which the duties performed rendered him an unclassified employee pursuant to R.C. 124.11(A)(9). Thus, immediately prior to appellant's reassignment in March 1995, appellant was not a classified employee despite the designation of his position number. Accordingly, we find unpersuasive appellant's contention that he was never "appointed" to the unclassified service by the appointing authority or that R.C.4121.121(B)(2) mandates that all positions in the BWC are in the classified service.
Appellant next contends that assuming R.C. 124.11(A)(9) is the controlling statute, the trial court erred in affirming the board order which adopted the ALJ's report and recommendation. As indicated above, the ALJ concluded appellant was an unclassified employee pursuant to R.C. 124.11(A)(9) because he acted for and on behalf of the BWC. R.C. 124.11(A)(9) provides, in part:
 (A) The unclassified service shall comprise the following positions, which shall not be included in the classified service, and which shall be exempt from all examinations required by this chapter:
* * *
 (9) The deputies and assistants of state agencies authorized to act for and on behalf of the agency, or holding a fiduciary or administrative relation to that agency * * *.
In his conclusions of law, the ALJ initially noted that because appellant was employed by a state agency, he may be found to have been employed within the unclassified service if it was determined that (1) he was authorized to act for and on behalf of the BWC, (2) he held a fiduciary relationship to the BWC, or (3) he held an administrative relationship to the BWC. As to fiduciary duty, the ALJ found that following his reassignment, appellant's duties did not constitute fiduciary activities requiring a sufficiently high degree of trust, confidence, integrity, or fidelity. The ALJ further found that appellant did not formulate policy during his reassignment, and he did not supervise employees during that time. Thus, the ALJ concluded that appellant did not serve in an administrative relationship with the BWC.
However, the ALJ concluded that appellant had authority to act for and on behalf of the BWC. In reaching this conclusion, the ALJ considered general concepts of agency law. The ALJ found appellant was not given express authority to act on behalf of the BWC; however, the ALJ concluded that appellant had implied authority to act for and on behalf of the BWC. In so concluding, the ALJ focused on appellant's contacts with the Industrial Commission, including appellant's contacts with the Industrial Commission's Chief Hearing Officer, Tom Connor, and appellant's attendance at meetings with management level personnel. The ALJ stated that appellant's narrow duty of implementing Crabtree
necessarily required that he communicate with representatives of the Industrial Commission. Based upon this, the ALJ concluded that appellant had implied authority to act for and on behalf of the BWC regarding the Crabtree implementation effort.
In affirming the board's adoption of the ALJ's report and recommendation, the common pleas court concluded, in part, that the order was supported by reliable, probative and substantial evidence and was in accordance with law. Appellant contends this was erroneous as a matter of law because appellant was not authorized to act for and on behalf of the BWC. Specifically, appellant contends the ALJ's reliance on agency principles was faulty because an agency relationship involves a fiduciary relationship, and the ALJ specifically found appellant was not in a fiduciary relationship with the BWC. Further, appellant asserts it was error for the ALJ to base his conclusion that appellant acted for and on behalf of the BWC solely on the fact that appellant had contact with the Industrial Commission. For the reasons that follow, we reverse the common pleas court's conclusion that the board's order was in accordance with law.
As indicated above, it is not within the province of this court to examine the evidence. Accordingly, we take the following presentation of evidence directly from the ALJ's report and recommendation. Applying the law to such evidence, we conclude as a matter of law that in carrying out his duties after his March 1995 reassignment, appellant was not an unclassified employee under R.C. 124.11(A)(9).
Appellant began his employment with the BWC as a staff attorney in 1977. In 1982, he was promoted to law director. As stated above, the Supreme Court decided Crabtree in 1994. The decision in Crabtree impacted the procedural operations of the Industrial Commission and the BWC and required wide-sweeping and long-term implementation effort. On January 5, 1995, the Industrial Commission and the BWC conducted a meeting in order to facilitate a consensus on implementation of Crabtree. In his capacity as BWC law director, appellant represented the BWC and presented an analysis of Crabtree. Mr. Annarino, then acting as executive secretary of the Industrial Commission, was also present at that meeting.
On January 9, 1995, appellant was involved in a committee that authored a document entitled "Crabtree Principles." The document set forth guidelines for BWC employees to follow when handling claims implicated by Crabtree. It was widely circulated at the BWC and was incorporated (in whole or in part) into various training and policy manuals.
In February 1995, Mr. Annarino became chief legal counsel for the BWC. On March 3, 1995, Mr. Annarino reassigned appellant to a position coordinating the BWC's effort to implementCrabtree. According to Mr. Annarino's March 3, 1995 memorandum of reassignment, appellant's new duties included the following:
 [Appellant was] expected to train appropriate BWC personnel on their proper role and responsibilities as they relate to Crabtree. [Appellant's] duties during this special assignment include field visitation for training and observation. [Appellant was] to file an itinerary of [his] travel plans and [his] planned course of work with [Mr. Annarino] by Thursday of each week * * *. [Appellant was] relieved of all current responsibilities except for [those involving the Crabtree] assignment.
Appellant's duties were specifically limited to those concerning the implementation of Crabtree I, and appellant was relieved of his supervisory duties. Mr. Travis was assigned to perform appellant's previous duties.
Mr. Annarino stated that one of his motivations in reassigning appellant was to limit appellant's exposure to an apparent controversy that existed at the time Mr. Annarino assumed duties as chief legal counsel. Specifically, Mr. Annarino indicated that at least two newspapers alleged that appellant had mismanaged the BWC legal department, and one newspaper mentioned appellant's name in connection with an inspector general's investigation. Questions involving appellant's alleged mismanagement of the BWC legal department were extensive enough to cause concern among his supervisors, including acting administrator William Pfeiffer, regarding appellant's management skills.
Appellant reported directly to Mr. Annarino, lost no pay and remained classified as an "Attorney 6." Mr. Annarino testified that he did not reduce appellant's authority or discretion. However, appellant contended he lost considerable authority, especially with regard to supervisory duties. Mr. Annarino further stated that appellant's particularized and somewhat unique ability to formulate and implement BWC policy with regard to Crabtree was a primary consideration in deciding to assign appellant Crabtree coordination duties. Mr. Annarino testified that Crabtree was an important, "legally-driven" decision, requiring ongoing policy formulation and implementation. Mr. Travis shared the same view of Crabtree. Both Mr. Annarino and Mr. Travis testified that appellant provided the policy formulation and implementation effort required by the evolving demands of Crabtree.
In contrast, both appellant and Kevin Abrams, an assistant law director at the BWC, asserted that Crabtree was not a difficult decision to implement. According to Mr. Abrams and appellant, the Industrial Commission developed a series of three resolutions between January 1995 and October 1995 which set forth Industrial Commission policy with regard to implementation ofCrabtree. Mr. Abrams and appellant stated that the BWC took steps to adopt policy in conformity with Industrial Commission policy as a general matter. Appellant and Mr. Abrams insisted that Crabtree policy was formulated by the Industrial Commission in its 1995 resolutions and was subsequently adopted by the BWC. Thus, Mr. Abrams and appellant both asserted that appellant could not have formulated Crabtree policy after he was reassigned from his duties as law director. Appellant contended that after his reassignment, he merely implemented those previously formed policies.
During the initial part of his reassignment, appellant traveled throughout the state as a member of a group called the Consistency Task Force ("CTF"). CTF consisted of appellant, claims services specialists and other claims representatives. The primary purpose of CTF was to facilitate the implementation ofCrabtree by answering questions in the regional claims service centers. According to Jennifer Spiropoulos, a claims service specialist in Columbus, Crabtree overpayment issues were very confusing to claims personnel in her office during the period of 1995 and 1996. The CTF field visits continued on a regular basis until September 1995, at which time they became sporadic and eventually ended.
Appellant testified that he often distributed his telephone number to personnel at the service centers, encouraging BWC employees to contact him if they had further inquiries aboutCrabtree implementation. Ms. Spiropoulos, Brenda White, the BWC's director of legislative information, and at least six other BWC employees inquired of appellant about a variety of legal issues not limited to Crabtree implementation. Further, there was evidence from appellant's weekly reports to Mr. Annarino that appellant answered inquiries from other BWC employees pertaining to Crabtree implementation. Appellant also provided Industrial Commission chief hearing officer, Mr. Connor, with updates on appellant's answers to questions posed by BWC claims technical service personnel.
On March 9, 1995, appellant advised Mr. Annarino that he had "begun to assemble all of the documentation relative to the implementation of this case. I have spoken with Tom Connor of the Industrial Commission who has advised that he will provide me with its materials * * *." On October 13, 1995, appellant forwarded to Mr. Connor appellant's responses to questions from BWC claims technical services personnel to ensure communication on the subjects therein. Appellant testified that such questions were routine and simple in nature.
In October 1995, appellant attended a meeting convened by Mr. Travis and attended by Mr. Connor and Paul Walker, legal counsel for the Industrial Commission. The purpose of the meeting was to discuss implementation of a second Crabtree decision. Appellant asserted he was a mere attendee at the meeting. Mr. Travis stated that appellant had significant authority to bind the BWC in discussions with the Industrial Commission.
On December 8, 1995, appellant attended a meeting of the "C-92A Project Team." "C-92A" is a short-hand term for the administrative process whereby the BWC adjudicates applications for increases in permanent partial awards. The purpose of the meeting was to discuss a proposal for eliminating the medical reviews in such cases. Matt Finnegan, an Industrial Commission hearing officer, represented the Industrial Commission at such meeting. Despite Mr. Finnegan's presence, appellant believed it was necessary to notify Mr. Connor of an issue raised by Mr. Finnegan in order to identify potential problems.
Appellant attended a subsequent meeting of the C-92A Project Team, and Mr. Connor attended as the Industrial Commission's representative. At that meeting, the team adopted a pilot program to address the issue originally raised by Mr. Finnegan at the previous meeting. On February 13, 1996, appellant met with Mr. Finnegan and representatives from the BWC's medical division to conduct a final review of the pilot program. It should be noted that appellant's attendance at the C-92A Project Team meetings was not directly related to his duties as theCrabtree coordinator, as Crabtree involved temporary total disability, and the C-92A project involved permanent partial awards.
On March 28, 1996, Mr. Connor inquired of appellant as to the application of Crabtree to medical treatment decisions. Mr. Connor desired to address that issue with Industrial Commission hearing officers, and he refreshed his knowledge by discussing the matter first with appellant.
As indicated above, on April 3, 1996, the BWC administrator informed appellant that his position was being formally placed in the unclassified service effective April 14, 1996. On May 24, 1996, appellant was terminated from his employment with the BWC.
We do not dispute the ALJ's conclusions that appellant was not in a fiduciary or administrative relationship with the BWC. Indeed and as found by the ALJ, Mr. Annarino's concerns regarding appellant reflected distrust and suspicion. (See Report and Recommendation at 53.) Further, the ALJ correctly determined that appellant had no supervisory duties and did not formulate official policy after his reassignment. The ALJ noted that appellant's implementation of Crabtree policy was not subject to analysis because it was the development of official policy that was relevant, not the implementation of such policy. The ALJ concluded that appellant had authority to implement policy, not formulate it.
Yet despite the above, the ALJ determined appellant was an unclassified employee because he was authorized to act for and on behalf of the BWC. Support for such conclusion came solely from the fact that appellant had contact with representatives of the Industrial Commission. The BWC agrees and contends appellant acted for and on behalf of the BWC in his capacity as the principal contact between the BWC and the Industrial Commission onCrabtree issues. Appellant asserts that acting for and on behalf of an agency contemplates a situation where one signs the appointing authority's name, responds to the media on behalf of the agency or sits as the agency's designee on various committees. Appellant asserts that he had no such authority.
The issue for this court to determine is what constitutes acting "for and on behalf of the agency." As noted by the ALJ, the language "authorized to act for and on behalf of the agency" was included in R.C. 124.11(A)(9) in October 1995. Prior to this, the relevant portion of R.C. 124.11(A)(9) read "* * * authorized to act for and in the place of their principals * * *." The current language is broader in scope as it speaks specifically to acting for and on behalf of the agency as a whole as opposed to merely acting for and in the place of an individual principal. Despite such seemingly broad language, this court finds that the new language cannot be given its literal meaning.
To "act" is to do a thing and "for" and "on behalf of" means in the interest of or as a representative of a person or thing. See Webster's Ninth New Collegiate Dictionary (1987) 53, 141, 481. Hence, a deputy or assistant of a state agency is acting for and on behalf of the state agency when he or she does something in the interest of or as a representative of the agency. Presumably, all state employees so act in carrying out their duties. Thus, if we were to give the language its literal meaning, all state employees would be unclassified. Obviously, this is not what the legislature intended. Even if we read "on behalf of" narrowly to include only those duties involving contact with persons or entities outside of the employee's specific agency, employees who would normally be considered classified employees could be deemed unclassified simply by virtue of the fact that they have contact with the public and/or other agencies. Again, this is not what is meant by such language. At this point, it is more helpful to define the language, "act[ing] for and on behalf of the agency," in the negative, i.e., such language does not encompass every act done for and on behalf of the agency.
While R.C. 124.11(A)(9) has been amended as indicated above, prior case law interpreting the former language, "act[ing] for and in the place of," is helpful in determining the meaning of the current language. In Mintus v. Trumball Cty. Child SupportEnforcement Agency (Apr. 25, 1995), Franklin App. No. 94APE10-1469, unreported (1995 Opinions 1735, 1736-1739), this court found an employee (whose position included supervising other employees) was not authorized to act for or in the place of his principal when the principal did not allow the employee to approve sick or vacation time without the principal's consent, the employee did not attend speaking engagements on behalf of the principal and although the employee made recommendations to the principal, final decision-making authority always resided with the principal. In Beery v. Ohio Bd. of Chiropractic Examiners (1990),66 Ohio App.3d 206, 210, this court found a state employee acted for and in the place of the State Board of Chiropractic Examiners because he represented the board in budgetary matters before the legislature, in negotiating for a new office space, and in a deposition.
We acknowledge that acting "in place of" can be distinguished from acting "on behalf of" in that acting in place of another implies doing an act normally done by another whereas acting on behalf of can imply merely acting in the interest of another. However, and as indicated above, such cannot be the meaning of the current language as all state employees would fall under this definition. Thus, we believe a more reasonable interpretation of "on behalf of" should center on representative duties. Yet, mere contact with the public and/or other agencies is not sufficient to place someone within this definition and, thus, within the unclassified service.
Rather, we believe that in order to be authorized to act for and on behalf of the agency, an employee must be authorized to act in place of or in substitution for a higher authority in the agency. Further, such acts must encompass more than ministerial acts and must involve some degree of autonomy on the part of the employee. We note that the duties (or lack thereof) this court found relevant in Mintus and Beery included duties that would also be pertinent to a determination of whether the employees were in fiduciary or administrative relationships with their principals. However, the language in both the former R.C. 124.11(A)(9) and the current version is in the disjunctive. The current statute states that the unclassified service is comprised of the deputies and assistants of state agencies authorized to act for and on behalf of the agency or holding a fiduciary or administrative relation to that agency. Nonetheless, we find that despite this language, the legislature did not intend to preclude consideration of duties that are fiduciary or administrative in nature when determining whether an employee is acting for and on behalf of an agency.
We find support for our holding in Ohio Adm. Code Chapter123:1-47. Specifically, Ohio Adm. Code 123:1-47-01 sets forth the definitions of state employment terms and states, in pertinent part:
 (A) For purposes of Chapters 123:1-1 to 123:1-47 of the Administrative Code:
* * *
 (8) "Assistant" — Means an employee who aids and assists an appointing authority in the discharge and performance of duties which are of a confidential and fiduciary character and which involve the responsibility of the principal, or an employee who holds a fiduciary or administrative relationship to the agency.
* * *
 (29) "Deputy" — Means an employee authorized by law to act generally for or in place of his or her principal and holding a fiduciary relationship to such principal, or an employee holding a fiduciary or administrative relationship to the agency.
R.C. 124.11(A)(9), in relevant part, applies specifically to "deputies" and "assistants." Although the definitions in Ohio Adm. Code 123:1-47-01 apply only for purposes of certain sections of the Ohio Administrative Code, such sections include Ohio Adm. Code 123:1-5-01, promulgated pursuant to R.C. Chapter 119, which addresses the unclassified service. Ohio Adm. Code 123:1-5-01(B) states that notices from appointing authorities of the appointment of deputies and assistants exempt from the classified service pursuant to R.C. 124.11(A)(9) shall be accompanied by a statement which includes the duties assigned to such appointees showing the appointees are acting for or on behalf of the agency and/or that they are performing duties that demonstrate an administrative and/or fiduciary relation with their agency.
Ohio Adm. Code 123:1-5-01(1) and (2) go on to specifically define "[a]dministrative relation" and "[f]iduciary relation," respectively. Noticeably absent is a definition of "acting for [and] on behalf of the agency." However, this language applies only to assistants and deputies, and the terms "assistants" and "deputies" are already defined in Ohio Adm. Code123:1-47-01(8) and (29). Because these Administrative Code sections are directly related to R.C. 124.11(A)(9), we find persuasive the definitions of "assistants" and "deputies" found in Ohio Adm. Code 123:1-47-01(8) and (29). Hence, we conclude that in order for an employee to be authorized to act for and on behalf of an agency, he or she must be a deputy or an assistant. A deputy or an assistant is a person who represents the agency (1) in place of the principal, or (2) through acts that would normally involve the responsibility of the principal.
Again, because the emphasis is on representing the principal, the duties of an assistant or deputy involve more than mere ministerial tasks and entail some form of discretion and autonomy such that would normally be the responsibility of the principal. For example, such charge may include the assignment of policy-making tasks or the substitution of the assistant or deputy for the principal at public speaking engagements or other official engagements and meetings. As to the latter example, the assistant or deputy, in carrying out such substitution, is not merely relaying information created by another. Rather, the deputy or assistant possesses some kind of autonomy and discretion in so acting. The discretion to convene an official meeting in an of itself is indicative of acting for and on behalf of the agency.
With these conditions in mind, we turn to the facts in the present case. Again, the ALJ's conclusion was based solely on the fact that appellant had contact with representatives of the Industrial Commission. However, the ALJ also found that after his reassignment, appellant merely implemented policy — he did not create it. For example, the ALJ concluded that appellant was more than a mere attendee at the October 1995 meeting with representatives from the Industrial Commission. Yet the ALJ himself found that appellant's presence at such meeting was in order for him to "collect and disseminate information regarding the policy set forth at such meeting[.]" (See Report and Recommendation at 49.) Mr. Travis convened such meeting. Id. at 48.
The ALJ did not find that appellant was involved in the policy-making at such interagency meetings or that he went as a direct representative with discretion to make decisions of an authoritative nature. The fact that appellant attended such meeting(s) and collected and disseminated information stemming from such meeting(s) did not make him an assistant or deputy acting for and on behalf of the BWC and its principal. Again, appellant only had the authority to implement Crabtree policy; he did not have the authority to speak for and in the place of those persons who actually could make policy decisions. Indeed, the evidence is that Mr. Annarino did not trust appellant, let alone give him the authority to independently speak for the BWC. When appellant did speak about Crabtree issues, it was merely reiterating policy that had already been formed. In fact, the ALJ found that Crabtree policy was already in place prior to appellant's reassignment, and appellant was not forming policy in answering questions posed to him by BWC employees. Id. at 55-56.
Simply put, appellant's duties after his reassignment, including his contact with the Industrial Commission, did not constitute acting for and on behalf of the BWC as defined above. Therefore, appellant was not an unclassified employee. The ALJ erred as a matter of law in concluding otherwise, and the board erred in adopting such conclusion. Hence, the trial court erred in affirming the board's order as such order was not in accordance with law.
Accordingly, appellant's second assignment of error is sustained.
In his first assignment of error, appellant contends the trial court erred in concluding that the administrator of the BWC had the authority to reclassify or reassign appellant to an unclassified position. The common pleas court's decision affirming the board's order was based on the court's determination that the administrator of the BWC had the statutory authority to reappoint appellant to a different position and reclassify him in the unclassified service within the BWC. In so holding, the common pleas court cited Section 7 of Am.Sub.H.B. No. 7, effective September 1, 1995, which states in pertinent part:
 For a period of eighteen months after the date the Governor appoints the Administrator of Workers' Compensation pursuant to this act, the Administrator has full authority to establish, change, and abolish positions and to assign, reassign, classify, reclassify, transfer, reduce, promote, or demote all employees of the Bureau of Workers' Compensation not subject to Chapter 4117. of the Revised Code. * * *
The trial court also cited to the following language in R.C. 4121.121(B)(2), which provides as follows:
(B) The administrator * * * shall do all of the following:
* * *
 (2) Employ, direct, and supervise all employees required in connection with the performance of the duties assigned to the bureau * * *. All positions of employment in the bureau are in the classified civil service except those employees the administrator may appoint to serve at the administrator's pleasure in the unclassified civil service pursuant to section 124.11 of the Revised Code. * * *
In construing the provisions of the above statutory language, the common pleas court concluded that:
 * * * [F]rom this statutory history and the plain meaning of both of these legislative texts * * * the Administrator of the Bureau could, and in this case did, reappoint Appellant Donner to a different position and reclassify him in the unclassified service within the Bureau. To hold to the contrary would go against the plain meaning of Section 7 quoted supra and would defeat the legislative intent to give the Administrator broad powers to reorganize and streamline the Bureau. (Common Pleas Court Decision at 3.)
The trial court further concluded that "[w]hile not using * * * exactly the same reasoning, the Personnel Board of Review properly could and did find that Mr. Donner was unclassified at the time of his removal in May of 1996." Id. We find that the common pleas court erred in affirming the board's order based upon an application of Am.Sub. H.B. No. 7.
We do not dispute the administrator's authority to reclassify, assign and/or appoint an employee to the classified or unclassified service. However, and as discussed previously, the actual duties assigned to and performed by the employee are dispositive of the employee's classification, not the employee's position number, title or the fact that the employee is carried on the payroll as being in the unclassified service. See Yarosh,supra; Freeman, supra; Suso, supra. Accordingly, the common pleas court's reliance on Am.Sub. H.B. No. 7 and R.C. 4121.121(B)(2) in support of affirming the board's order was erroneous.
Therefore, appellant's first assignment of error is sustained.
Having sustained each of appellant's assignments of error, the judgment of the Franklin County Court of Common Pleas affirming the board's order is reversed. This cause is remanded to such court with instructions to reverse the board's order finding it lacked subject-matter jurisdiction over the matter.
Judgment reversed and cause remanded with instructions.
LAZARUS, P.J., concurs in judgment only.
DESHLER, J., dissents.